CROWN CORK & SEAL CO. OF BALTIMORE CITY v. BROOKLYN
BOTTLE STOPPER CO. et al.   SAME v. AMERICAN CORK
SPECIALTY CO. et al.   SAME v. JOHNSON.

(Circuit Court, E. D. New York.   June 12, 1911.)

1. PATENTS (§ 287*)—SUIT FOR INFRINGEMENT—PARTIES.

Individuals who organized a corporation with a small capital for the purpose of enabling them to infringe a patent through the corporation without subjecting themselves to personal liability may be joined with the corporation as defendants in a suit for the infringement, and held jointly liable therefor.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 459; Dec. Dig. § 287.*

Persons liable for infringement of patent, see note to Westinghouse E. & Mfg. Co. v. Allis-Chalmers Co., 100 C. C. A. 414.]

2. PATENTS (§ 297*)—SUIT FOR INFRINGEMENT—PRELIMINARY INJUNCTION.

In a patent suit, where the parties are not willing to rest the case on final hearing on the papers presented on an application for preliminary injunction, or where the attention of defendants has not been called to the patents by prior adjudications, sustaining their validity, exceptional circumstances must be shown to justify the granting of a preliminary injunction in advance of the taking of the testimony.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 481; Dec. Dig. § 297.*]

In Equity.   Suit by the Crown Cork & Seal Company of Baltimore City against the Brooklyn Bottle Stopper Company, Emilio Alberti, James Alberti, and John Alberti.   Same against the American Cork Specialty Company and Joseph Mundet, otherwise known as "Jose Mundet," and same against Aaron Johnson.   On motions for preliminary injunction.   Motions denied.

Philipp, Sawyer, Rice & Kennedy (Robert H. Parkinson and James Q. Rice, of counsel), for complainant.

Robert B. Killgore (Alfred C. Coxe, Jr., of counsel), for defendants.

CHATFIELD, District Judge.   [1] Three actions have been brought against different parties who occupy substantially similar positions so far as the present application for a preliminary injunction is concerned.   One of them, Johnson, is an individual who seems to be financially responsible.   In the other cases the principal defendant is a corporation, but individual defendants have been joined, because the corporation has been so organized, with such a small amount of paid-up capital and so little corporate responsibility, that it must be held that the individual responsible stockholders are the parties actually interested, and that they are proper defendants in a suit involving, not only the rights as to certain patents, but questions of accounting for profits and personal decrees with reference to the operations of those corporations.   Crown Cork & Seal Co. of Baltimore City v. Brooklyn Bottle Stopper Co. (C. C.) 172 Fed. 225.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

But it is urged that the method of organization of these corporations and the secrecy with which they have conducted the making of the product (by the use of machines which will be considered later) indicate that some knowledge, or at least apprehension, has existed on the part of the defendants. Yet in the same breath the complainant urges that no defense of laches is available, although the record shows that it has had knowledge that these various defendants were putting upon the market a product which is now discovered to be produced by machines which the complainant contends infringe its method and machine patents. None of these questions seem to be sufficient ground upon which to rest a determination of the application for preliminary injunction. As has been said, the personal defendants are proper parties, and their apparent desire to avoid personal financial responsibility, and their knowledge of the zeal with which the complainant has ordinarily investigated all machines affecting the complainant's business explains their actions; so that it cannot be conclusively held upon affidavits that these personal defendants knew or expected that they were actually infringing any patents. Even the remarks attributed to Mr. Johnson are not admitted in the form in which they are charged. But, whichever language be taken, they do not show more than ordinarily explainable precautions, provided the defendants' intentions and knowledge be innocent of the idea of infringement, and hence a preliminary injunction cannot be based upon such statements alone.

Articles like the complainant's product, generally known as metal caps or closures for bottles, are becoming more and more extensively used. It appears that there is also a considerable independent trade, and that a total output last year of over 30,000,000 gross of these caps was consumed. Some one-third of this output came from independent sources; that is, from makers other than the complainant. But the complainant by its license system, through which it controls the various machines for applying these caps and limiting their use to caps bought of the complainant and also machines for making the caps (which the complainant alleges are covered by its patents), has built up for the complainant an exceedingly profitable business, and one in which absolute perfection of operation and preservation of the contents of the bottles capped is of the greatest importance. An examination of the record shows that imperfect caps, in the form known as "puffers," were for a long time the object of experimentation, and have to do directly with the patents involved on this motion. The cap of the complainant, consisting of a tin shell with fluted rim, a thin layer of cork, and in between the cork and the tin a disk of paper treated with some adhesive gum, requires (especially when used for highly charged contents like ginger ale or soda) perfect union between the lip of the bottle and the cap. The natural imperfections or interstices in the cork are partially filled up by the exertion of pressure. The gummed paper, more or less adhering to the cork and tin, aids in the effective closing of these openings or imperfections. The construction of these caps, with the application of heat and pressure, forces out any gas or steam, so that the melted gum makes a close or impervious seal, with a much more

nearly uniform percentage of perfection than when the cork disks were first used in caps of this sort.

These general objects are what were sought to be obtained by the complainant's patents. One Painter, who took out the original patent for the cap itself in the year 1892 (which therefore expired by limitation in 1909, since which time the defendants have largely increased the output of such caps) also patented a method in 1905, on an application filed June 6, 1902, under No. 792,284, in which he describes the method of compressing the cork disk, gummed paper, seal, and the tin cap in a feeding device which would cause the disks, under pressure, to be passed over a heating apparatus, allowing a supply of heat sufficient to melt the gum upon the paper disk, and then to keep the disks under compression until sufficient chance for the gum or adhesive portion of the disks to cool or set and retain the cork in close adhesion to the inside surface of the cap, with little chance for dislodgment in handling and applying to the bottles, and also without much likelihood of the formation of bubbles or air spaces between the tin and the cork. It was found, however, that sufficient caps showed imperfections to make improvement necessary, and one Wheeler upon the 19th of May, 1908, obtained letters patent No. 887,883, upon an application filed in 1905, in which he patented a machine for carrying out an improvement of the Painter method in the patent above referred to. On the same day, Painter himself had obtained a patent, No. 887,838, on an application filed May 24, 1905, for a machine to carry out the method described by him in his earlier patent. Both the Wheeler patent and the Painter patent were intended to produce machines for doing the same work, but Wheeler's idea actually came later, and was an improvement upon Painter's idea, even though the patents were issued at the same time. In the Wheeler patent the essential difference from the Painter machine lay in the application of the heat first and the exertion of pressure against the cork disk after sufficient heat had been exerted upon the cap, not only to melt the gum and to render adhesion easy, but also to expand any air, liquid, or gas which might be contained in any part of the cap, and which could with difficulty be forced out even by the amount of heat used, if pressure had already been applied. It is easy to see that the Painter machine, assuming that the quantity of gas were not so small in amount as to be substantially negligible, would have to exert a bursting strain before it would be expelled, if the cap were under severe pressure, whereas in the Wheeler machine the application of heat would cause expansion and probable expulsion of this gas, even if small in quantity, before or at the time of the application of pressure.

The machines used by the defendant companies are substantially alike in principle, and were made, or some of them were made, by the defendant Johnson, who admittedly constructed the one produced as an exhibit. The substantial feature of the defendants' machines is the use of two disks, the first of which carries the caps in oval spaces or depressions around the outside of its upper face, during which time a section of the plate and the caps thereon is subjected to the intense heat of an arrangement of Bunsen burners. The second disk has a

series of plungers around the upper face, held in place each by a separate spring, and released automatically by a cam, which allows the plunger to rise sufficiently to give space for the transfer of a heated cap from the first disk to one of the spaces immediately under a raised plunger upon the outside edge of the surface of the second disk. The release of the plunger, when the disk has turned beyond the operation of the cam, applies pressure to the cap, already heated to a point where the gums have melted and the gas has been expelled or expanded, and the cap thus under pressure is carried completely around to a point where, when the cam raises the plunger, the cap will be touched by a finger which throws it out into a chute. As has been said in the first Painter machine patent and in the Painter method patent, the caps appear to have been subjected to pressure, then heated, and then allowed to cool somewhat before the pressure is removed. In the Wheeler patent, the caps are carried upon the face of a disk, and by an arrangement of spaces and a spiral track are meanwhile moved from the center toward the circumference. The heat is applied by steam near the center, and then the plungers exert pressure while the caps are carried a certain distance. Then, the plungers being released, the caps are expelled upon the outer or cooled portion of the disk, where the temperature is rapidly reduced, under the influence of a water-jacket.

In the defendants' structure no cooling apparatus or water-jacket is used, but some lowering of temperature (to whatever extent this may be effected) is accomplished by the removal of the caps from the zone in which heat is applied before the plungers act. The real point, so far as the question of infringement is concerned, depends upon whether or not the use of the two disks, the application of pressure to the caps after they have left the heated zone, but while they are still in a position to receive more or less heat, and the lack of any attempt to cause great reduction of temperature or artificial cooling, is a patentable invention by itself, or is so different from the operation of the Wheeler process as not to be an infringement thereof. Unusual as it may seem, when considering the question of use of the Painter and Wheeler patents, no adjudication has ever been had. Public acquiescence, to the extent of great sale of the product and recognition of commercial availability, and general respect for the scope of these patents and for the probability of valid ownership on the part of the complainant, is indicated. But, again, the natural effect of these elements is counteracted by the license system which the complainant has so generally endeavored to protect, and by the fact that the patent upon the cap itself has but recently expired, thus opening the field to persons desiring to make these caps, without thereby involving them in an infringement suit over the caps themselves.

The defense of laches would not seem to be so persuasive upon the affidavits presented, and there seems to be strong probability that the Painter and Wheeler patents, especially in view of the fact that no patents in the prior art have been set up in the affidavits or presented by the expert who furnished one of the affidavits, other than the Painter patent for the formation of the cap, are likely to be sustained

as describing and covering valid inventions. On the other hand, while discussion upon these motions has been limited to certain claims, and while the general purpose of the defendants' devices depends upon similar processes and produces the same results as the Wheeler improvement of the Painter patents, nevertheless the determination as to the claim of infringement of the machine accomplishing these results will depend, to a great extent, upon the testimony of the witnesses, and a comparison of the operation of these machines, in connection with a study of their construction, upon final hearing. Painter in his method patent, No. 792,284, says:

"My novel method or process consists, first, in interposing a suitable fusible protecting and binding medium between the packing or sealing disks or gaskets and the coincident inner surfaces of the metal co-operating therewith and of which the crown-caps are composed; secondly, while the caps, disks, and fusible binding medium are properly heated for fusing said medium subjecting the whole to appropriate pressure, and, thirdly, while still heated and the packing held under controlling pressure hardening the binding medium or permitting it to harden by cooling it, the disk, and cap. Inasmuch as the slow cooling of these parts precludes many of the valuable economic advantages accruing from hardening the fused medium as promptly as possible, one feature of my invention consists (in this final step) in subjecting the cap, disk, and fused binding medium to artificial cooling influences for promptly cooling them while under controlling pressure."

His claim is as follows:

"First, in interposing a suitable fusible protecting and binding medium between the packing or sealing gasket and the coincident surfaces of the metal co-operating therewith; secondly, heating the metal, the gasket and the binding medium for properly fusing the latter, and in the meantime subjecting the whole to appropriate pressure; and thirdly, cooling the metal and avoiding injury to the gasket from undue heating and hardening the fusible medium while maintaining said appropriate pressure."

It will be seen that he uses the words "in the meantime"; that is, at some time during the process of heating and fusing. But his drawings show and the other language of his patent indicates, that he actually had in mind the converse of what he said; that is, that he intended to exert the metal gasket and the medium to pressure, and in the meantime fuse the medium by heat. His machine patent similarly says: "Properly heating the cap, gasket and the medium, and meantime subjecting the whole to appropriate pressure." And, again: "But however heated the organization of the heater with the timing-table should be such as to appropriately heat the caps on the loaded presser blocks during their progressive movement." The claims of this patent which are relied upon, viz., 2 and 6, however, use the words "heating means and means for engaging the packing to hold it under compression while the closure is cooling." And "holding the said members under this pressure and while cooling." If this language alone were considered, we might have the exact idea suggested by the Wheeler patent, which in claims 1, 4, 7, 23, and 27 (the ones directly affected by the motion) provide for means for heating the assembled members of the closure, while free to allow the expanded air to escape, and means for pressing the parts together while cooling. Under this language of Wheeler, a machine like that

of the defendants, if the closures or caps are reduced in temperature at all, so as to cause cooling of the parts or hardening of the interposed binding material, as is provided for in claim 6, would seem to be within the broad language of the Wheeler claims.

But, again, the defendants suggest that no appreciable change in temperature occurs while the caps are being carried around the second disk of their machine. They claim that Wheeler intended by his patent only to suddenly or quickly cool the caps after pressure had been exerted, and they thus seem to ignore the idea, which Wheeler undoubtedly appreciated and expressed, that the application of heat, and the accompanying expansion of gases, while melting the binding medium, is to be accomplished to the necessary point before any pressure is exerted. Even if Wheeler had the idea that a sudden and extreme cooling was advantageous, and if the defendants find that a great change in temperature is not necessary, they will have to show that their device does not produce such a change of temperature by transfer from the heating disk where pressure is to be exerted as to free them from the language of the Wheeler claims, and they immediately lay themselves open to the charge of being within the general idea of the Wheeler patent, as to the order in which or the time at which pressure should be applied. To avoid this they charge that Painter really suggested the idea which Wheeler tried to patent, and that Wheeler, or any one else, should have realized from the Painter patent that applying pressure in the meantime did not mean or did not suggest the application of pressure, and then heating; and if the Painter patent covered this idea, making the Wheeler patent invalid —that is; if the Patent Office was wrong in ascribing invention to the Wheeler patent—then the defendants say that the bill in the present action is multifarious, in that it is trying to sustain two patents, which cannot validly exist as the basis of a single right, or that the complaint could be objected to as multifarious.

This objection has not been taken to the pleadings, but points out one of the defenses. The amount of testimony involved in this case should be extremely small in amount, owing to the peculiar circumstances involved in the charge of laches, and the entire lack of attack upon the Painter patent up to the present time, coupled with the almost complete barrenness of the prior art upon the subject. The questions of fact as to the operations of the machines can be easily ascertained, and while a determination would seem almost within the scope of this hearing upon affidavits, and while the testimony of experts may be of little use other than to state the object of their empirical observations, and while there would seem to be sufficient acquiescence and freedom from laches to make it possible to satisfy the court even upon preliminary hearing; nevertheless, the advantage to be gained and the likelihood of inability on the part of the defendants to comply with the order of the court, even if the complainant should recover, would not seem to be sufficient to justify an assumption by the court that it can by its own study and upon preliminary affidavits anticipate the exact form in which a thorough presentation of the testimony may set forth the issues as a whole.

[2] In a case where the parties are not willing to rest their final hearing upon the papers presented for the consideration of the application for preliminary injunction, or where the attention of the defendants has not been called to the patents by prior adjudication sustaining their validity, it seems to this court that exceptional circumstances must be shown to justify the use of a preliminary injunction in advance of the taking of testimony. Wright Co. v. Hering-Curtiss Co., 180 Fed. 110, 103 C. C. A. 31; Same v. Paulhan, 180 Fed. 112, 103 C. C. A. 32.

The withholding of such an injunction will facilitate and quicken the final hearing of the case. The granting of such an injunction may prevent the hearing of the case, even if any valid defense exists, or may lengthen the time necessary to take the testimony, both because no immediate haste is called for on the part of the complainant, and because the defendants are anxious to get away from the scope of the preliminary injunction, even at the expense of unnecessary taking of testimony.

For these reasons this court has set forth the questions as they occur upon this application, and has indicated its impressions of the scope of the proposition advanced, but will refuse to make an ultimate determination until the parties leave the matter in its hands for final determination.

Motion for preliminary injunction denied.